**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

SARAH JO ANNE CHAPPUIS          )
                                     )
             Plaintiff,         )
                                     )
vs.                               )    Case No. 17-cv-00019-JPG-CJP
                                     )
NANCY A. BERRYHILL,           )
Acting Commissioner of Social Security,   )
                                     )
            Defendant.[1]     )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Sarah Jo Anne Chappuis (plaintiff), represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB on September 4, 2013, and for SSI on January 13, 2014, alleging a disability onset date of August 19, 2012. (Tr. 225-41.) Plaintiff's claims were denied at both the initial and reconsideration levels and she later requested a hearing (Tr. 12; 93-129.) Administrative Law Judge (ALJ) Robert S. Robison conducted the evidentiary hearing on May 17, 2016 (Tr. 35-92), and issued an unfavorable decision on July 29, 2016. (Tr. 14-34.) The Appeals Council denied review, and the ALJ's decision became the final agency decision. (Tr. 1-6.) Plaintiff exhausted her administrative remedies and filed has a timely complaint in this Court. (Doc. 1.)

## Issues Raised by Plaintiff

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

Plaintiff makes the following arguments:

1. The ALJ failed to properly weigh the medical evidence.

2. The ALJ erroneously evaluated plaintiff's subjective complaints.

3. The hypotheticals the ALJ posed to the vocational expert (VE) failed to account for her limitations in concentration, persistence, or pace.

## **Applicable Legal Standards**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.  The second step evaluates whether an alleged physical or mental impairment is severe, medically

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, the Court must determine: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) ([u]nder the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that the Commissioner made no mistakes of law. This scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but only whether the ALJ's findings were supported by substantial evidence and whether the ALJ made any errors of law. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). While judicial review is deferential, however, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## <u>The Decision of the ALJ</u>

ALJ Robison followed the five-step analytical framework set forth above. He determined plaintiff met the insured status requirements through September 30, 2017 and had not engaged in substantial gainful activity since August 19, 2012. ALJ Robison determined plaintiff had severe impairments of residuals of cervical spine fusion following a motor vehicle accident with comminuted C6 fracture, with two subsequent motor vehicle accidents in 2010 and 2011 and myalgias and myositis; fibromyalgia with 18/18 tender points after hearing; headaches;

adjustment disorder; anxiety; and depression. (Tr. 19.) The ALJ opined plaintiff had moderate difficulties with concentration, persistence, or pace, which "could reasonable [sic] cause moderately [sic] limitations in concentration with detailed or complex tasks only; however, the evidence suggests she can still concentrate sufficiently to sustain the performance of simple, routine tasks with no limitations in persistence or pace." (Tr. 20.) The ALJ determined plaintiff had the RFC to perform light work with additional limitations. (Tr. 21.) ALJ Robison found plaintiff was unable to perform any past relevant work, but was not disabled because she was able to perform other jobs that existed in the economy. (Tr. 27-28.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

In the agency forms, plaintiff alleged a neck injury, anxiety, depression, kidney stones, urinary tract infections, and a fracture of the C6 vertebrae limited her ability to maintain employment. (Tr. 266.) Plaintiff completed three years of college and previously worked as a nurse. (Tr. 267, 298.)

Plaintiff stated she had trouble getting out of bed in the mornings because of pain and anxiety. She had difficulty standing and sitting due to pain from her neck injury and was restless. She experienced numbness and weakness in her hands. Her anxiety hindered her concentration and she became anxious with any amount of stress. (Tr. 278.) Plaintiff laid in bed most of her mornings and rested inside the remainder of the day. Plaintiff's mom helped transport her son. Plaintiff could not sleep for more than a couple hours at a time. She was

unable to cook because of a lack of energy from her medication, pain, numbness, weakness in her neck, arms, and hands, and nausea. Plaintiff could not perform household chores. She could not go out alone because she had no energy and her medications impaired her judgment. Plaintiff could not pay bills, count change, handle a savings account, or use a checkbook. (Tr. 288-90.) Plaintiff stated her medications for anxiety, depression, and pain made employment impossible. (Tr. 287.) She indicated her only hobby was watching television. (Tr. 291.)

Plaintiff could walk about twenty to thirty minutes before needing to rest. She could pay attention for approximately ten minutes and sometimes could not follow written instructions at all. She handled spoken instructions "better." (Tr. 292.)

Plaintiff alleged she was fired from a job because of problems getting along with others. She could not handle stress well and she preferred a routine. (Tr. 293.)

## 2. Evidentiary Hearing

ALJ Robison presided over an evidentiary hearing on May 17, 2016, at which plaintiff was represented by counsel.

Plaintiff testified she could use a computer for about ten minutes before she experienced contractions and her hands went numb. She needed a twenty-minute break before she could use the computer again. (Tr. 55-56, 68.) She used her phone to text, look at emails, and visit Facebook. Plaintiff could use the microwave to heat up leftovers and make simple meals. She could dress and bathe herself. (Tr. 55-56.)

Plaintiff was involved in three motor vehicle accidents. In 2003, an accident resulted in a fracture of a vertebra in her neck, along with a herniated disc, for which she underwent a fusion surgery. She subsequently returned to work. In 2010, plaintiff was involved in a head-on collision. In 2011, another vehicle rear-ended plaintiff. (Tr. 57-59.)

Plaintiff's parents drove her from Springfield, Illinois to Florida in 2012 for vacation. Plaintiff and her husband lay on the beach and tried to relax. She did not actually get in the water but stayed in the shallow area along the shore. (Tr. 59-62.)

In 2013, plaintiff attended a St. Patrick's Day parade, where people ate and drank throughout the day and night. Plaintiff was at the parade for about four hours. She had drinks and ate lunch. (Tr. 64-65.)

Plaintiff visited the emergency room a handful of times since 2012 for panic attacks and pain. She never stayed overnight for mental health reasons. Plaintiff did not have a psychiatrist, psychologist, therapist, or counselor. (Tr. 66-67.)

Plaintiff received trigger point injections in her trapezius area, which relieved, but did not prevent, contractions. (Tr. 69.) Plaintiff discussed pain, migraines, achiness, and stiffness with Dr. Fortin.[3] She discussed her anxiety, depression, headaches, and pain with Dr. Western. (Tr. 70.)

A VE testified at the hearing regarding several hypothetical individuals with various functional limitations. The first hypothetical person was plaintiff's age and had the same background and work experience. She could perform light work but could not climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, crawl, and climb; could occasionally reach overhead; could not operate motor vehicles; had to avoid hazards; could understand, remember, and carry out simple, routine tasks; was able to use judgment in making work-related decisions; could interact appropriately with the public, co-workers, and supervisors; and could respond appropriately to changes in routine in the normal work environment. (Tr. 79-81.) The VE opined this person could not perform plaintiff's past work but could perform other positions that existed in the economy, such as a housekeeper, fast food worker, and sorter. (Tr. 81-82.)

---

[3] The hearing transcript refers to a "Dr. Fordon," which the Court believes to be Dr. Fortin.

If the same hypothetical individual were also limited to only occasional interaction with the public, she would be unable to maintain employment as a fast food worker, but could work as a bench assembler.  (Tr. 82.)

If the hypothetical person was additionally limited to a work environment where she had to only occasionally make commensurate decisions and there were no more than occasional changes in routine, she could work as a housekeeper, bench assembler, and sorter.  (Tr. 82-83.)

If the hypothetical person was limited to sedentary work, instead of light work, she could not perform the previously identified jobs.  She could work, however, as a sealer, circuit board screener, and assembler.  (Tr. 83-84.)

The unskilled, SVP 2 jobs identified permitted two fifteen-minute breaks, a lunchbreak of approximately twenty to thirty minutes, and two unscheduled breaks, one in the A.M. and one in the P.M., to be less than six minutes each.  (Tr. 84-85.)  An employer would tolerate no absences during a probationary period of ninety days and then one absence each month, not to exceed ten absences.  These absences included vacation, personal, and annual leave days.  A person who was absent more than one day each month would not be able to maintain employment.  (Tr. 85-86.)

### 3. Medical Records

Throughout the relevant period, plaintiff consistently reported headaches; neck, shoulder, and back pain; and fatigue.  She also complained of anxiety, numbness in her hands, left arm weakness, and aching in her legs.  Plaintiff primarily treated with Dr. Claude Fortin, Dr. Randy Western, and Chris Carver, a nurse practitioner.

In February 2012, plaintiff demonstrated a positive Tinel's sign at both elbows and point tenderness over the trapezius, bilaterally.  Dr. Fortin assessed plaintiff with cervicalgia and

cervical radiculopathy. He prescribed plaintiff gabapentin and suggested trigger point injections. (Tr. 436-39.)

In March 2012, plaintiff presented to Dr. Katie Asp. A review of plaintiff's symptoms demonstrated neck and arm pain, and weakness on the left side. Dr. Asp assessed plaintiff with cervicalgia. She advised plaintiff to continue her gabapentin and consider trigger point injections. (Tr. 474-75.)

In July 2012, Dr. Western also assessed plaintiff with cervicalgia, along with fatigue. He prescribed hydrocodone and noted plaintiff "[h]ad been doing relatively well" until a recent "flare up." (Tr. 400-01.)

In August 2012, plaintiff followed up with Dr. Asp and reported numbness and tingling in her hands, and pain radiating up and down her arms. Trigger point injections offered her "good relief" but the pain eventually returned. Dr. Asp assessed plaintiff with cervical radiculopathy. (Tr. 476-77.)

In November 2012, x-rays of plaintiff's lumbar spine demonstrated no fracture or malalignment. (Tr. 425, 605-06.) An x-ray of her sacrum coccyx was normal. (Tr. 431.)

On March 16, 2013, plaintiff presented to St. John's Hospital with complaints of an altered mental status. Plaintiff's boyfriend stated plaintiff was "drinking and partying all day" and was lying in bed when she experienced tremors. Plaintiff was assessed with alcohol intoxication. The hospital advised her to avoid drinking large amounts of alcohol and discharged her. (Tr. 380-86.)

In August 2013, Dr. Western prescribed plaintiff Carisoprodol and Tramadol for her cervicalgia and ordered an x-ray of the cervical spine. (Tr. 396-97.) The x-ray revealed an anterior cervical fusion at C5-C7 with stable postsurgical changes without evidence of hardware

complication. (Tr. 424.) Plaintiff also presented to Dr. Fortin and, upon examination, demonstrated point tenderness in the trapezii, full nuchal range of motion, and no occipital nerve tenderness. Her motor strength was 5/5 throughout and her gait was steady. Dr. Fortin included occipital neuralgia in his diagnosis and administered trigger point injections to plaintiff's trapezii. (Tr. 472-73, 455.)

In July 2014, plaintiff presented to Red Bud Regional Hospital with complaints of neck and shoulder pain, and numbness and tingling in both hands. She was assessed with cervical radiculopathy and discharged home with prednisone and Norco. (Tr. 590-96.)

In August 2014, Dr. Western noted new symptoms of achiness in plaintiff's legs and increased arm weakness. Dr. Western also observed plaintiff had "a fairly strong component of anxiety" and prescribed her Prozac. (Tr. 728-29.)

In October 2014, plaintiff presented to Ms. Carver and reported bilateral knee and elbow pain, which worsened during the previous six months. On examination, plaintiff demonstrated a normal gait and her strength was 5/5 in the upper and lower extremities. Plaintiff's attention span and concentration were adequate. Ms. Carver assessed plaintiff with Klippel's disease, cervicalgia, cervical radiculopathy, myalgia and myositis, and joint pain in the knee and elbow. Ms. Carver referred plaintiff to a rheumatologist and administered trigger point injections along the right and left paracervical and trapezius muscle regions. (Tr. 570-71; 725.)

X-rays of plaintiff's left and right elbows from December 2014 returned "negative" impressions. (Tr. 670-71.) An x-ray of plaintiff's left knee showed mild lateral patellar tilt suggesting a patellar tracking abnormality and an x-ray of plaintiff's right knee showed slight lateral patellar tilt, but was otherwise unremarkable. (Tr. 672-73.) Plaintiff presented to Dr. Jeffrey Horvath that same day and he noted the images were "fairly unimpressive." On

examination, plaintiff demonstrated a normal gait, excellent grip, and intact strength, sensation, and reflexes. Her wrists, elbows, and shoulder all moved well without tenderness or synovitis. She had full range of motion of the knees. Dr. Horvath assessed plaintiff with knee and elbow joint pain and cervical myofascial pain syndrome. (Tr. 574-75.)

In March 2015, Ms. Carver assessed plaintiff with occipital neuralgia, and myalgia and myositis. He increased plaintiff's dosage of gabapentin and administered left occipital nerve block and bilateral trigger point injections. (Tr. 577-78.)

MRIs of plaintiff's lumbar spine from April 2015 demonstrated mild spondylosis. (Tr. 579-80, 791-92.) MRIs of her cervical spine showed a cervical fusion at C5-C7 and relatively mild spondylosis. (Tr. 580-81, 789-90.)

On May 15, 2015, plaintiff reported her anxiety symptoms were fairly well-controlled with Prozac and Lorazepam, but there was room for improvement. Plaintiff also reported her pain was much improved since the increased dose of gabapentin. Her naprozen also helped with pain. (Tr. 897-99.)

On May 29, 2015, plaintiff received trigger point and occipital nerve block injections. (Tr. 893). Ms. Carver noted,

> The MRI of the cervical spine does show the previously completed fusion however there are no other findings which would be contributing to her level of discomfort. The MRI of the lumbar spine is also essentially negative. There are no findings which would be contributing to the difficulty sitting that she reports. . .I indicated I would complete the [disability] paperwork as well as possible however she may need to see another provider to obtain an examination as thorough as what is requested on the 6 page form. I requested additional information, she states she has not been able to work for the past 3 years indicating she has difficulty sitting or standing however this does not appear to be the case when she has been in this office.

(Tr. 894). When Ms. Carver pressed plaintiff for more information she stated she was "too anxious." An addendum noted plaintiff contacted the office requesting Dr. Fortin complete the

form because she was concerned Ms. Carver would "negatively affect her" disability claim. (Tr. 894-96).

In June 2015, plaintiff received trigger point injections. She presented to Dr. Fortin with complaints of persistent left arm tingling and left hand involuntary jerking. Her hand numbness and spasms appeared to be worsening. Dr. Fortin noted the sedation was likely attributable to her increased dose of gabapentin. He ordered an EMG of plaintiff's left arm and reduced the gabapentin. (Tr. 888-90.)

In October 2015, plaintiff underwent an EMG and nerve stimulation study in the left arm and cervical paraspinal muscles. The findings were unremarkable. She received occipital nerve block injections and Dr. Fortin noted fibromyalgia type symptoms. Dr. Fortin's assessment included fibromyalgia, for which he prescribed Co-Q10 and magnesium. (Tr. 864-68.)

On November 30, 2015, plaintiff received trigger point and occipital nerve block injections. (Tr. 851-52.) Plaintiff complained of headaches and tingling in her arms. She was taking Prozac for depression. Her Cymbalta was not helpful and she was very drowsy. (Tr. 853-55.)

Plaintiff received occipital nerve block and trigger point injections in January 2016. She continued to complain of disabling fatigue, restless limbs, and "tickly" in her arms at night. She was frequently sleepy. Dr. Fortin's assessment included chronic fatigue. (Tr. 843-46.)

Plaintiff underwent a sleep study on January 23, 2016 and gave a history of snoring and daytime fatigue. She demonstrated no significant sleep disordered breathing. (Tr. 841.)

In February 2016, plaintiff presented to Dr. Harris with complaints of immobility and muscle weakness. Plaintiff visited the emergency room the previous week with an episode of light-headedness, palpitations, dizziness, and shortness of breath. She stated she had significant

headaches and disabling fatigue that almost "paralyze[d] her." Her symptoms were worsening over the previous couple of months. Dr. Harris prescribed plaintiff Verapamil. (Tr. 834-36.)

In March 2016, plaintiff attended a follow-up appointment with Dr. Harris and reported feeling exhausted, experiencing increased anxiety and a racing heart, and continued issues with nausea and loss of appetite. (Tr. 821-23.)

In April 2016, Dr. Ish Singla assessed plaintiff with fatigue and tachycardia, which was likely benign and attributable to anxiety/stress. (Tr. 813-16.)

In May 2016, Dr. Fortin assessed plaintiff with fibromyalgia. (Tr. 809-12.) Dr. Horvath confirmed Dr. Fortin's diagnosis that same month. He noted plaintiff's long-standing history of chronic diffuse widespread pain in both muscles and joints, with soft tissue tenderness. Plaintiff demonstrated 18/18 fibromyalgia soft tissue tender points and a fibromyalgia impact questionnaire (FIQ) score of 27 out of 31. Dr. Horvath based his diagnosis on plaintiff's clinical presentation, multiple soft tissue tender points, and an FIQ score "much greater than 13." Dr. Horvath recommended a regular, low impact aerobic exercise program. He also assessed plaintiff with anxiety, depression, and fatigue. Dr. Horvath suggested a healthy diet, heat therapy, and a trial of cognitive behavioral therapy or a psychologist. (Tr. 801-04.)

### 4. Dr. Randy Western's Disability Impairment Questionnaire

On May 3, 2016, Dr. Western completed a Disability Impairment Questionnaire and expressed that his opinions applied as far back as August 1, 2012. (Tr. 615-19.) He listed diagnoses of anxiety, depression, myofascial pain, migraine headaches, fibromyalgia, and occipital neuralgia. He indicated plaintiff's impairments were expected to last at least twelve months. He stated plaintiff was not a malingerer. Plaintiff's primary symptoms were headaches and daily pain in her neck, arms, hands, legs, and back. Weather, activity, mental stress, and

anxiety aggravated plaintiff's pain.  (Tr. 615-16.)

Dr. Western stated plaintiff could perform a job in a seated position for less than one hour in an eight-hour workday.  She could perform a job standing and/or walking for less than one hour.  She could frequently lift and/or carry up to five pounds, occasionally lift up to ten pounds, and never lift more than ten pounds.  She could frequently grasp, turn, and twist objects with her left and right hands; occasionally use both hands and/or her fingers for fine manipulations; and never/rarely use either arm for reaching.  Plaintiff's symptoms would frequently interfere with her attention and concentration.  She required unscheduled breaks every hour.  Plaintiff would likely be absent from work more than three times each month.  Anxiety and depression magnified plaintiff's pain.  (Tr. 617-19.)

### 5.      Dr. Claude Fortin's Questionnaires

In June 2015, Dr. Fortin completed a Spinal Impairment Questionnaire.  Dr. Fortin diagnosed plaintiff with neck pain, a cervical fusion, and degenerative spine disease.  Plaintiff had a limited range of motion in her neck, along the trapezius.  She also had trigger points along the posterior neck and trapezius.  Plaintiff's impairments limited her to sitting and standing/walking for two hours in an eight-hour workday.  (Tr. 583-88.)

In May 2016, Dr. Fortin completed a Disability Impairment Questionnaire.  (Tr. 620-24.)  Dr. Fortin indicated his opinions applied as far back as August 1, 2012.  (Tr. 624.)  He listed plaintiff's diagnoses as cervicalgia, cervical radiculopathy, migraine headaches, chronic fatigue, low back pain, and fibromyalgia.  Abnormal MRIs of plaintiff's cervical and lumbar spine supported his opinions.  He expected plaintiff's impairments to last at least twelve months.  Dr. Fortin stated plaintiff was not a malingerer.  Her primary symptoms were headaches, constant neck and bilateral arm pain, and fatigue.  (Tr. 620-21.)

Dr. Fortin opined plaintiff could perform a job in a seated position for less than one hour in an eight-hour workday. She could perform a job standing and/or walking for less than one hour in an eight-hour workday. Plaintiff could frequently carry up to five pounds, occasionally carry up to twenty pounds, and never carry more than twenty pounds. She could occasionally grasp, turn, and twist objects with both hands; occasionally use both hands and her fingers for fine manipulations; and never/rarely use either arm for reaching. Plaintiff's symptoms would frequently interfere with her attention and concentration. Dr. Fortin opined plaintiff would need to take unscheduled breaks every thirty minutes. She would likely be absent from work more than three times each month. Her anxiety may reduce her tolerance to pain. (Tr. 622-24.)

**6.      Dr. Harry Deppe's State-Agency Psychological Examination**

On December 12, 2013, Dr. Deppe conducted a psychological consultation of plaintiff. Plaintiff stated she was prescribed lorazepam, which calmed her down when her neck hurt. She described her sleep as fair to good and her appetite as good. She stated she spent her average day cleaning, doing laundry, watching television, and shopping. Her relationships with others were good. Dr. Deppe opined plaintiff's ability to relate to others; understand and follow simple instructions; and maintain attention required to perform simple, repetitive tasks were intact. Her ability to withstand the stress and pressures associated with day-to-day work activity was good. Dr. Deppe diagnosed plaintiff with adjustment disorder, with mixed emotional features. (Tr. 551-54.)

**7.      Dr. Vital Chapa's State-Agency RFC Assessment**

On December 12, 2013, Dr. Chapa evaluated plaintiff. He noted complaints of neck pain and a limited range of motion of the cervical spine. There was no definite evidence of cervical radiculopathy on examination and no muscle atrophy. Plaintiff's reflexes were symmetric and

her sensory examination was within normal limits. Her handgrips were 5/5 in both hands. (Tr. 555-60.)

### 8.   State-Agency Psychiatric Review Techniques

Dr. Lionel Hudspeth performed a psychiatric review technique of plaintiff on December 19, 2013. He diagnosed plaintiff with affective and anxiety-related disorders and determined plaintiff had mild difficulties in maintaining concentration, persistence, or pace. (Tr. 97-98.) Dr. Donald Henson rendered the same opinions on June 19, 2014. (Tr. 109-10.)

### 9.   Dr. Lenore Gonzalez's State-Agency RFC Assessment

On December 20, 2013, Dr. Charles Kenney determined plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; sit for a total of about six hours in an eight-hour workday; and push and/or pull and unlimited amount. (Tr. 99-101.) On June 24, 2014, Dr. Gonzalez made the same findings. (Tr. 111-12.)

### <u>Analysis</u>

Plaintiff first contends the ALJ erred in evaluating the opinions of plaintiff's treating physicians. Pursuant to 20 C.F.R. § 404.1527(c), the Social Security Commission gives controlling weight to a medical opinion from a treating source, so long as it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is (ii) "not inconsistent with the other substantial evidence in [the] case record."

Dr. Fortin and Dr. Western completed questionnaires from plaintiff's attorney regarding plaintiff's functional capacity, in which they opined plaintiff could sit and stand/walk for less than one hour. (Tr. 620-24.) The doctors expressed these opinions by circling "<1" under pre-typed questions, but did not elaborate on the basis for these opinions. Instead, they listed evidence such as MRIs in another section entitled "Clinical and laboratory findings that support

your diagnoses," which preceded three pages of function-related questions. The ALJ afforded the statements limited weight after concluding the record did not support such "extreme" restrictions. (Tr. 26.)

The ALJ pointed out that during several physical examinations, the doctors noted no atrophy or acute distress, a consistently normal or steady gait, and 5/5 muscle strength and motor function. He also referred to the statements as "assembly-line medical source statement check-off forms" and observed that plaintiff was able to sit "well over an hour at the hearing . . . ." (Tr. 26.) The ALJ's analysis is logical and he "minimally articulate[d]" his reasons for assigning the medical source statements little weight. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (ALJ properly discredited treating source opinion, in part, because the source expressed the opinion by writing "yes" next to a pre-typed question without elaborating on the basis); *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989) (stating "the ALJ's reliance on his own observations could hardly be more appropriate" where the claimant's case "rested in large part" on her limitations in sitting and standing).

Plaintiff also asserts the ALJ erred in not expressly weighing the factors in 20 C.F.R. § 404.1527 when evaluating the statements. If the ALJ determines the treating physician's opinions are not entitled to controlling weight, he must weigh the opinions like any other medical evidence, in consideration of the factors set forth in 20 C.F.R. § 404.1527(d). *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). These factors evaluate (1) whether an examining relationship existed; (2) the treatment relationship, including the length, nature, and extent of the treatment; (3) whether the physician's opinion is supported by sufficient explanations and objective medical evidence; (4) whether the physician's opinion is consistent with other opinions in the record; (5) whether the physician is a

specialist; and (6) any other factors brought to the ALJ's attention.

The Seventh Circuit has not clearly opined on whether an ALJ must explicitly list the factors. In *Campbell*, the Seventh Circuit remanded a case where "[t]he ALJ's decision indicate[d] that she considered opinion evidence in accordance with [the regulations]", but did not "explicitly address the checklist of factors as applied to the medical opinion evidence." *Campbell*, 627 F.3d at 308. However, in *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013), the Seventh Circuit stated that "while the ALJ did not explicitly weigh each factor in discussing [the treating physician's] opinion, his decision makes clear that he was aware of and considered many of the factors". *See also Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008) (ALJ not in error when he addressed only two of the six factors); *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (stating "[t]he ALJ did not explicitly weigh every factor while discussing her decision to reject [the treating source's] reports, but she did note the lack of medical evidence supporting [the] opinion . . . and its inconsistency with the rest of the record.").

Despite the ambiguity, the regulations state the ALJ will "consider" the factors, but do not impose a duty to elaborate on each one, 20 C.F.R. § 404.1527, and the Seventh Circuit has not definitively held otherwise. Here, it is evident from ALJ Robison's decision that he considered the factors. He acknowledged Dr. Western was plaintiff's primary care physician and Dr. Fortin was plaintiff's treating neurologist (factors one and five). ALJ Robison also detailed the objective evidence the doctors utilized, such as physical examinations, MRIs, and nerve conduction studies (factor three). In sum, the ALJ's opinion establishes he was aware of and considered the factors in the regulations. Thus, his evaluation of the medical evidence was not erroneous.

Plaintiff next asserts the ALJ improperly evaluated plaintiff's subjective complaints. A

credibility[4] determination is entitled to "special deference," and the reviewing court will overturn it only if it is "patently wrong." *Briscoe v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). ALJ Robison opined:

> the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence . . . .

He noted plaintiff experienced relief from treatment; was treated at the ER for alcohol intoxication after "partying all day" in 2013; travelled to Florida; reported significant activities of daily living (ADLs) such as cleaning, laundry, and grocery shopping; and did not exhibit difficulty sitting for longer than an hour at the hearing.

Plaintiff asserts the ALJ erroneously equated plaintiff's ADLs, vacationing, and "partying" with an ability to maintain employment. The Seventh Circuit has "urged caution in equating [ADLs] with the challenges of daily employment." *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014). However, it is proper for the Commissioner to consider a claimant's activities pursuant to SSR 16-3p, which provides the ALJ will consider an individual's "daily activities" when evaluating "the intensity, persistence, and limiting effects of an individual's symptoms."

Here, ALJ Robison did not equate plaintiff's activities with fulltime employment but, rather, used the evidence to contradict her specific complaints. Plaintiff alleges she is disabled, in part, because she cannot sit or stand/walk for more than an hour at a time. Thus, driving to Florida from Illinois, attending a parade "all day," and engaging in household chores bears directly on plaintiff's allegations of how her impairments affect her functioning. Moreover, the

---

[4] SSR 16-3p took effect on March 16, 2016, and supersedes SSR 96-79 ("Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements"). The new ruling eliminates use of the term "credibility," but is only a clarification.

ALJ specified other valid reasons for finding plaintiff's complaints not entirely consistent with the record. *See Schreiber v. Colvin*, 519 F. App'x 951, 962 (7th Cir. 2013) (ALJ properly considered plaintiff's ADLs because he did not place "undue weight" on them). For instance, ALJ Robison noted plaintiff could sit for more than an hour at the hearing and received relief from trigger point injections. Although plaintiff contends considering plaintiff's response to treatment was an error, SSR 16-3p directs an ALJ to consider the "treatment. . .an individual receives . . . for relief of pain or other symptoms" when evaluating credibility. The ALJ's assessment of the intensity, persistence and limiting effects of plaintiff's symptoms may not have been perfect, but it was not "patently wrong." *Schreiber*, 519 F. App'x at 961.

Plaintiff also attacks the basis of the RFC assessment and asserts the ALJ erroneously failed to accommodate plaintiff's limitations in concentration, persistence, or pace in the hypotheticals posed to the VE. The two arguments fold into each other, so they will be addressed as one. "RFC is what an individual can still do despite his or her limitations," and "must be based on *all* of the relevant evidence in the case record." SSR 96-8p. The Seventh Circuit "generally [has] required the ALJ to orient the VE to the totality of a claimant's limitations," which is best accomplished when the ALJ includes all of the claimant's limitations "directly in the hypothetical." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

Here, the ALJ stated in his decision that plaintiff has moderate difficulties in concentration, persistence, or pace, which "could reasonable [sic] cause moderately [sic] limitation in concentration with detailed tasks only." However, "she can still concentrate sufficiently to sustain the performance of simple, routine tasks with no limitations in persistence or pace." (Tr. 20.) The ALJ incorporated into his RFC that plaintiff was able to "understand, remember, and carry out simple tasks that are routine." (Tr. 21.) His hypothetical to the VE

included an identical limitation.

Neither the RFC nor the hypothetical accounted for moderate difficulties maintaining concentration. A line of Seventh Circuit cases has repeatedly rejected the notion that confining a person to simple, routine tasks captures limitations in concentration, persistence, or pace. *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015), and cases cited therein. *See also O'Connor-Spinner*, 627 F.3d at 620.

The Commissioner, however, asserts that a hypothetical need not list every detail of a claimant's impairments if the VE reviewed all of the evidence prior to hearing. The Seventh Circuit has stated that a hypothetical need not include the exact phraseology "concentration, persistence, or pace" if "the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." *O'Connor-Spinner*, 627 F.3d at 619. "The exception to the general rule, however, does not apply where, as here, the ALJ poses a series of increasingly restrictive hypotheticals to the VE, because in such cases we infer that the VE's attention is focused on the hypotheticals and not on the record." *Id.*

The Commissioner's argument is unavailing because there is no indication the VE independently reviewed the medical record or actually heard testimony addressing plaintiff's difficulties in concentration. Moreover, the ALJ utilized a series of increasingly restrictive hypotheticals, which also causes the exception to fall out of play.

The hypotheticals in the present case failed to account for plaintiff's limitations in concentration, persistence, or pace, and the VE was not oriented to all of plaintiff's limitations. Because the ALJ relied on the VE's testimony in steps four and five of his analysis, the decision was not based on substantial evidence. Remand is therefore required.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:  October 10, 2017**

<u>*s/ J. Phil Gilbert*</u>
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**